UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

DANIEL LEACH,                                    CIVIL NO. 10-4279 (SRN/JSM)

      Plaintiff,

v.                                              <u>REPORT AND RECOMMENDATION</u>

MICHAEL J. ASTRUE
Commissioner of Social Security,

      Defendant.

The above matter is before the undersigned United States Magistrate Judge on Plaintiff's Motion for Summary Judgment [Docket No. 9] and Defendant's Motion for Summary Judgment [Docket No. 11]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons stated below, this Court recommends that Plaintiff's Motion for Summary Judgment be denied and Defendant's Motion for Summary Judgment be granted.

## I.   PROCEDURAL BACKGROUND

Plaintiff is a former construction worker who was injured on the job on July 1, 2005, when he was struck by a car while working on a road crew. (Tr. 355). Plaintiff protectively filed his application for DIB and for SSI on March 13, 2009. (Tr. 123-134). Plaintiff's claims were initially denied on May 14, 2009, and denied on reconsideration on October 22, 2009. (Tr. 52, 72-73). Plaintiff filed a written request for a hearing before an Administrative Law Judge ("ALJ") on October 30, 2009. (Tr. 76). A hearing was held before an ALJ on February 8, 2010. (Tr. 22-46). On February 16, 2010, the ALJ issued a Notice of Decision unfavorable to plaintiff. (Tr. 7-17). On March 15, 2010,

plaintiff filed a request for review with the Office of Disability Adjudication and Review Appeal Council.  (Tr. 116-122).   On October 7, 2010, the Social Security Appeals Council denied plaintiff's request for review, making the ALJ's decision final.  (Tr. 1); 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 CFR §§ 404.981, 416.1481.

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. §1383(c)(3) [Docket No. 1].  The parties are now before the Court on Plaintiff's Motion for Summary Judgment [Docket No. 9] and Defendant's Motion for Summary Judgment [Docket No. 11].

## II.    PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a).  The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A).  The claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A);  see also 20 CFR §§ 404.1509, 416.909.

## A.      Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 CFR §§ 404.907-09, 416.1407-09.  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.  42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 CFR §§ 404.929, 416.1429.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 CFR §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727.  The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

## B.      Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 CFR §§ 404.967-404.982, 416.1467-1482.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 CFR §§ 404.981, 416.1481.

C.    **Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of plaintiff's impairments.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole.   42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also

Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 CFR §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of

proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.   DECISION UNDER REVIEW

### A.    The ALJ's Findings of Fact

The ALJ concluded that plaintiff was not entitled to disability insurance benefits under Sections 216(i) and 223(d) of the Social Security Act, or supplemental security income under Section 1614 (a)(3)(A) of the Social Security Act.  (Tr. 10).  In reaching this conclusion, the ALJ made the following findings:

1.   The claimant met the insured status requirements of the Social Security Act through December 31, 2010.

2.   The claimant has not engaged in substantial gainful activity since October 31, 2007, the alleged onset date (20 CFR 404.1571 et. seq. and 416.971 et. seq.).

3.   The claimant has the following severe impairments: degenerative disc disease of the lumbar spine; piriformis syndrome[1]; and sacroiliitis with chronic pain (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d); 404.1525, 404.1526, 416.920(d), 416.925 and 416.925.

---

[1]     "Piriformis syndrome is a rare neuromuscular disorder that occurs when the piriformis muscle compresses or irritates the sciatic nerve-the largest nerve in the body. The piriformis muscle is a narrow muscle located in the buttocks.  Compression of the sciatic nerve causes pain-frequently described as tingling or numbness-in the buttocks and along the nerve, often down to the leg.  The pain may worsen as a result of sitting for a long period of time, climbing stairs, walking, or running." http://www.nind.nih.gov/disorders/piriformis_syndrome/piriformis_syndrome.ht.

5.      The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) as lifting and carrying 20 pounds occasionally and 10 pounds frequently, standing and/or walking up to 6 hours of an 8 hour day, and sitting up to six hours of an 8 hour day, allowing a change of position every 30 minutes, no more than occasional balancing, stooping, crouching, kneeling and crawling, and avoiding the climbing of ropes, ladders and scaffolds, work at heights or near hazards or hazardous machinery, and exposure to extremes of temperature and vibration, and limited to routine, repetitive, low stress work setting with low to moderate standards for pace and production.

6.      The claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible to the extent they are inconsistent with the residual functional capacity assessment.

7.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8.      The claimant was born on June 19, 1966 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

11.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a).

12.     The claimant has not been under a disability, as defined in the Social Security Act, from October 31, 2007 through the date of this decision (20 CFR. 404.1520(g) and 416.920(g).

(Tr. 12-17)

### B.  The ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step process.  At step one in the disability evaluation, the ALJ determined that plaintiff had not engaged in substantial gainful activity since October 31, 2007.  (Tr. 12).  At step two, the ALJ found that plaintiff had the severe impairment of degenerative disc disease of the lumbar spine; piriformis syndrome; and sacroiliitis with chronic pain. (Id.).  At step three, the ALJ determined that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  Specifically, the ALJ relied on the testimony of Dr. Frank Indihar, the impartial medical expert, who opined that, based on a review of the entire medical record, there was insufficient evidence to support the severity of a listed musculoskeletal impairment.  (Tr. 13).

Before reaching the fourth step of the evaluation process, the ALJ evaluated plaintiff's residual functional capacity ("RFC") and plaintiff's subjective complaints regarding his condition and the limiting effects of his condition. (Tr. 13).  The evidence the ALJ considered included plaintiff's testimony, his medical records, the Physical Residual Functional Capacity Assessment completed by the state agency examiner Dr. J. DeBorja (Tr. 481-489), testimony from Dr. Frank Indihar, the impartial medical expert (Tr. 37-41), and Mitchell Norman, the impartial vocational expert ("VE").  (Tr. 42-45).  Based on all of this evidence, the ALJ concluded that plaintiff had an RFC to perform light work and that his overall functioning was inconsistent with a finding of disability.  (Tr. 13, 15).  The ALJ noted that plaintiff was living independently, driving, and engaging in independent personal care and a wide range of household tasks.  He was also caring for his two teenage daughters, "getting out into the community on a

regular basis to visit friends, shopping and attending appointments as needed."
(Tr. 16).

In reaching his conclusions about plaintiff's RFC, the ALJ did not place great
weight on the opinions of plaintiff's treating physician, Dr. Ulrich, that plaintiff would not
be able to perform any employment in the foreseeable future. (Tr. 15, 345). The ALJ
incorporated some of Dr. Ulrich's opinions into his conclusions regarding plaintiff's RFC,
but rejected the more restrictive limitations suggested by Dr. Ulrich as not supported by
the medical evidence. (Tr. 15). The ALJ placed significant weight on the opinion of the
independent medical expert, in light of the expert's review of the entire medical record,
his medical expertise, familiarity with the Social Security Administration's regulations
and plaintiff's testimony. (Id.). The ALJ also found that the non-examining opinions of
the state examiners supported by the findings he had made. (Id.)

At step four of his analysis, the ALJ concluded that plaintiff's RFC precluded him
from performing past relevant work. (Tr. 16).

At step five of the evaluation, the ALJ considered the opinion of the VE, who
testified that for the light duty RFC described above, plaintiff could perform such
occupations as mail clerk (4,800 jobs in the regional economy), housekeeper (8,800
jobs in the regional economy) and at the sedentary work level, order clerk (6,500 jobs in
the regional economy) and lens inserter (1,100 jobs in the regional economy). (Tr, 17).
The ALJ found that the VE's testimony was consistent with information in the Dictionary
of Occupational Titles. Based on the testimony of the VE, the ALJ concluded that,
considering plaintiff's age, education, work experience, and RFC, he was capable of
making a successful adjustment to work that exists in significant numbers in the national

economy.  (Tr. 17).  As a result, the ALJ concluded that a finding of "not disabled" was

appropriate.  (Id.).

## IV.    THE RECORD[2]

### A.    Medical Records

Plaintiff was born on June 19, 1966 and is currently 45 years old.  (Tr. 437).  On

July 1, 2005, while working for Ulland Brothers Construction, he was hit by a car, mainly

in the lower back.  (Tr. 420, 424).  Plaintiff was taken to the Albert Lea Medical Center

where he was seen in the emergency room.  (Id.).  Plaintiff's immediate complaint was

of neck and lower back pain.  (Id.).  X-rays of his cervical spine and lower lumbosacral

spine showed no fracture.  (Tr. 420.).  Dr. Michael Ulrich, who evaluated plaintiff on the

same day as the accident, diagnosed a contusion and sprain to plaintiff's lower back.

Dr. Ulrich recommended one or two tablets of Vicodin, a narcotic analgesic, every six

hours for pain. (Id.).  Plaintiff was discharged from the emergency room in good and

---

[2]    Defendant has objected to Plaintiff's submission of two medical articles and one set of medical records from 2006 with his motion for summary judgment.  See Defendant's Mem. in Support of Summary Judgment ("Def. Mem."), pp. 12-13 [Docket No. 12]; Plaintiff's Motion for Summary Judgment ("Pl. Mem."), pp. 17-25 [Docket No. 10].  Defendant asserted, and plaintiff did not contest, that these materials were not submitted to the Administrative Law Judge and are not part of the administrative record. In determining whether the ALJ's decision was supported by substantial evidence, this Court will not consider evidence that the ALJ never considered.  See Baker v. Barnhart, 457 F.3d 882, 891 (8th Cir. 2006) ("In the context of judicial review of a decision of the Commissioner regarding SSI disability benefits, evidence outside the administrative record generally is precluded from consideration by the court.").  One article is from the National Institutes of Health website, which this Court independently consulted for information on piriformis syndrome.  See fn. 1, supra.  The other is an article on sacroiliitis from the Mayo Clinic's website.  The Court assumes that plaintiff has provided these articles merely to assist the Court and not to supplement the record and the Court has treated them as such.  To the extent that the 2006 medical records were not before the ALJ, the Court did not find that these records (reflecting an EMG test done on plaintiff on March 29, 2006), contained any information that would have affected the ALJ's determination in light of the record as a whole.

stable condition, but with tenderness in his right lower and left lower cervical area and right mid and lower and left mid and lower lumbar area.  (Tr. 422).

Dr. Ulrich saw plaintiff on July 11, 2005 for a follow-up examination.  (Tr. 418). Dr. Ulrich noted that plaintiff was still in a lot of discomfort and that he had pain at the lower lumbosacral area, and some neck discomfort.  (Id.).  Plaintiff rated his pain as 8 out of 10 at this time.  (Id.).  Dr. Ulrich noted that plaintiff was walking with discomfort. (Id.).  Ulrich stated that plaintiff "has significant disability.  I do not feel that he is fit to return to work at this time.  He is still taking a narcotic analgesic during the day to control the pain."  (Tr. 418).

Dr. Ulrich saw plaintiff three days later, on July 14, 2005.  (Tr. 416).  Dr. Ulrich reported that plaintiff had gone to physical therapy twice, and had some benefit from that.  At its worst, plaintiff's pain was at 5 out of 10, and at its best, it was at 1 or 2 out of 10.  (Id.).  Dr. Ulrich indicated that plaintiff experienced some discomfort on palpation of lower lumbosacral area, but there was no bony tenderness.  (Id.).  Plaintiff reported to Dr. Ulrich that he "does not feel that he could do any type of activities" and Dr. Ulrich was concerned "because of the degree of pain and the fact that he remains on narcotic analgesic."  (Id.).  Dr. Ulrich believed that he could get plaintiff back to light duty or sedentary duty early the following week, but until then he opined that plaintiff was unfit to return to work.  (Id.).  Dr. Ulrich charted plaintiff's prognosis as good.  (Id.).

Dr. Ulrich saw plaintiff again on July 18, 2005.  (Tr. 414).  Plaintiff had attended a physical therapy session in which he received soft tissue work and electrical stimulation to his mid back, which Dr. Ulrich noted was helpful.  (Id.)  Dr. Ulrich stated that "patient appears to be coming along very well.  I am going to recommend increasing level of activity to sedentary duties which are listed on return work order as primarily sitting,

11

stretch[ing] or rest[ing] every hour, stand[ing] and walk[ing] as tolerated, bending and lifting none." (Id.).  Dr. Ulrich suggested a trial of plaintiff "operating the roller," a reference to plaintiff's work on a road construction crew. (Id.).

Dr. Ulrich saw plaintiff two days later, as a result of plaintiff's subjective complaint of increased pain. (Tr. 412).  Plaintiff had attempted to operate the roller and had found the associated vibration from the machine to be very uncomfortable. (Id.).  Plaintiff reported his pain to be 7 to 8 out of 10. (Id.)  Examination of plaintiff's back showed some pain to palpation in the right lower lumbosacral area. (Id.)  Dr. Ulrich indicated that he would declare plaintiff unfit for work for that day, and the next, and then "very likely" attempt to have plaintiff return to sedentary duty. (Id.).  Dr. Ulrich recommended that plaintiff continue with physical therapy. (Id.).

Plaintiff was seen for another follow-up with Dr. Ulrich on July 22, 2005.  At that visit, he rated his pain "up to" 7 out of 10.  Dr. Ulrich observed that he "would have expected the patient's injuries to get much better by this time" so he decided to refer plaintiff to a physiatrist. (Tr. 410).  Dr. Ulrich was out of the office for the next week-and-a-half, and so he referred plaintiff to Drs. Berger and Shaman to be seen in his absence. (Id.).[3]

Dr. Berger saw plaintiff on July 28, 2005. (Tr. 409).  Plaintiff rated his pain as 5 out of 10. (Tr. 410)  Dr. Berger recommended continuing sedentary restrictions. (Id.)  Dr. Berger saw plaintiff the next day.  Plaintiff reported pain in his sacroiliac joint ("SI joint"). (Id.).  Plaintiff reported that his worker's compensation insurer had agreed to an

---

[3]    There is no explanation in the record as to why Dr. Berger continued to treat plaintiff, apparently after Dr. Ulrich's return.  Nonetheless, through June 28, 2006, Dr. Berger continued to treat plaintiff. (Tr. 362).

MRI, so Dr. Berger recommended that plaintiff follow up with Dr. Ulrich a day or two after the MRI.  (Id.).

Plaintiff saw Dr. Berger on August 9, 2005 for an interpretation of the MRI.  The MRI showed a posterior disk bulge at L5, but nothing else, and "a little" degenerative change.  (Tr. 407).  Dr. Berger recommended continuing work restrictions and to have plaintiff follow up in a couple of weeks.  (Id.).  At his next visit with Dr. Berger on August 23, 2005, Dr. Berger commented that plaintiff's physical therapist was recommending lumbar traction.  (Tr. 406).  Dr. Berger warned plaintiff that lumbar traction had the potential to either improve plaintiff's condition, or make it worse, but that he would give the lumbar traction a trial.  (Id.).

Plaintiff returned to Dr. Berger on September 8, 2005.  (Tr. 405).  Plaintiff reported to Dr. Berger that he was feeling "25% better" and was working with his physical therapist three times a week.  (Id.).  The lumbar traction aggravated the area of plaintiff's pain, so it was discontinued.  (Id.).  Dr. Berger recommended continued physical therapy three times a week, to continue his work restrictions, and to follow up in two weeks.  (Id.).

At his next visit with Dr. Berger on September 22, 2005, plaintiff reported that his pain was "at least 60% better" and that he was continuing his work with the physical therapist.  (Tr. 404).  Dr. Berger had given plaintiff a referral to a pain clinic, but plaintiff did not go, reporting that he had a bad headache and overslept that day.  (Id.).  Dr. Berger again recommended continuing work restrictions and physical therapy with follow-up in two weeks.  (Id.).

Plaintiff saw Dr. Berger again on October 6, 2005.  (Tr. 401).  At that appointment, plaintiff indicated that his work restrictions were "going okay" and that he

had been increased to a 30-hour work week, which he was tolerating "okay." (Id.). Plaintiff expressed some frustration to Dr. Berger about his work with Ulland Brothers Construction ("he is a little frustrated with working with the company."), but Dr. Berger did not describe the nature of plaintiff's frustration. (Id.). By October 24, 2005, plaintiff had returned to a 40-hour work week and reported to Dr. Berger that he was pleased with his progress. (Tr. 400).

On October 20, 2005, an independent medical examination ("IME") was conducted of plaintiff by Dr. David Fey in connection with his worker's compensation injury. Dr. Fey noted that plaintiff was seeing a chiropractor every other week and was engaged in a home exercise program. (Tr. 450). Dr. Fey reviewed plaintiff's medical records and conducted his own physical examination of plaintiff. (Tr. 449-456). Dr. Fey did not believe that the finding of a "bulging" disc on the MRI was related to mild degenerative disc disease and was not related to his accident. (Tr. 454). In Dr. Fey's opinion, plaintiff "has no current diagnosis related to the motor vehicle accident of July 1, 2005" and had "an essentially normal physical examination and require[d] no further diagnostic testing, medical care, chiropractic care or physical therapy as a result of the injury sustained in the accident of July 1, 2005." (Tr. 455). Dr. Fey believed that plaintiff sustained a mild soft tissue sprain/temporary aggravation of a pre-existing degenerative disc disease of the lumbar spine as a result of his accident. (Tr. 454). Dr. Fey concluded that plaintiff had no assignable Permanent Partial Disability based on the Minnesota Department of Labor and Industry Permanent Partial Disability schedule. (Id.).

At a November 4, 2005 appointment, Dr. Berger again noted that plaintiff was working a 40-hour week, with restrictions. (Tr. 399). At that visit, Dr. Berger recommended that plaintiff discontinue his physical therapy, continue a home program of care, and referred plaintiff to a pain clinic for consideration of a trigger-point injection of Depo-Medrol.[4] (Id.).

Dr. Edward Grayden saw plaintiff on December 8, 2005 to administer the Depo-Medrol injection. (Tr. 395). Dr. Grayden noted that plaintiff had intermittent pain in his right low back and right buttock, described as an aching sensation in the right low back. Sitting greater than 30 minutes, lifting and bending aggravated plaintiff's pain, but walking and changing position relieved it. (Id.). Plaintiff stated he was taking one tablet of Vicodin one to two times a week. (Id.). Dr. Grayden noted a medical history of pneumothorax, chemical dependency and tobacco use of one pack of cigarettes a day for the past twenty years. (Id.). A week later, on December 12, 2005 plaintiff returned to Dr. Berger and reported that the injection helped "maybe a little bit." (Tr. 393). At this time, plaintiff was no longer working for Ulland Brothers Construction and sought a restriction form to give to his attorney. (Id.).

Plaintiff returned to Dr. Grayden on January 19, 2006. (Tr. 391). At this visit, he told Dr. Grayden that the trigger point injection resulted in an "immediate decrease" in his pain. (Id.). He reported that his pain level was currently at 2 to 3 out of 4. (Id.). When examining plaintiff's back, Dr. Grayden noted a very localized area of pain. (Id.).

---

[4]     Depo-Medrol is an anti-inflammatory glucocorticoid. See http://www.accessdata.fda.gov/drugsatfda_docs/label/2009/011757s085s086lbl.pdf. A "glucocorticoid" is a "any steroid-like compound capable of significantly influencing intermediary metabolism such as promotion of hepatic glycogen deposition, and exerting a clinically useful anti-inflammatory effect. Stedman's Medical Dictionary 754 (27th ed. 1995).

Dr. Grayden gave plaintiff another Depo-Medrol injection.  (Id.).  At an office visit on January 23, 2006, plaintiff told Dr. Berger  that he wanted to go to Mason City, Iowa for a surgical opinion.  (Tr. 389).

On January 26, 2006, Dr. Berger wrote to Thomas R. Patterson, an attorney representing plaintiff in connection with his workers compensation claim.  (Tr. 387). Dr. Berger wrote that trigger point injections had not provided a significant amount of relief to plaintiff and that since plaintiff had not been successful with conservative care and therapy that Dr. Berger wanted to get an opinion from a neurosurgeon.  (Id.). Dr. Berger further noted that "[i]n my opinion I do feel that his work injury is a substantial contributing factor.  Patient obviously had some degenerative changes in the spine prior to the injury but the injury certainly aggravated this area.  I feel that the injury was a substantial contributing factor not only to the cause of his condition but also to the aggravation or acceleration of it."  (Id.).  Dr. Berger referred plaintiff to Dr. David Beck in Iowa.  (Tr. 384).

Plaintiff was seen by Dr. Beck at the Mercy Medical Center in Mason City, Iowa on March 8, 2006.  (Tr. 238).  This exam noted a moderate sized disc bulge at L2-3 and smaller bulges at  L1-2, L3-4 and L4-5.  Id.  The medical record from this visit also notes "moderate central stenosis L2-3, possibly involving traversing L3 nerves.  [M]ild stenosis at L3-4 without significant stenosis elsewhere, at least while recumbent."  (Id.).  On March 24, 2006, Dr. Berger noted that Dr. Beck had done a myelogram, but the myelogram did not explain plaintiff's pain.  (Tr. 380).  Plaintiff had undergone an MRI of his hip, but that was normal.  (Id.).

On April 18, 2006, registered occupational therapist Patty Peterson conducted a functional capacities evaluation in connection with plaintiff's worker's compensation

claim.  (Tr. 246-249).   Peterson found that in an 8-hour day, plaintiff could sit for six hours and stand and walk for 8 hours.   (Tr. 246).   After reviewing the functional capacities evaluation report, Dr. Berger noted that plaintiff "fits medium restrictions." (Tr. 370).   On May 3, 2006, Dr. Berger made a chart entry, independent of an office visit by plaintiff, that "[plaintiff's employer] ha[s] been making him run[ ] heavy equipment 14 hours a day, which is ridiculous.  A lot of pounding on his back.  He is in a lot of pain and discomfort.  Issues apparently with his boss."  (Tr. 368).   Under the heading "plan" in his chart, Dr. Berger wrote that plaintiff was not to work more than 8 hours a day and was not to be running heavy equipment.  (Id.).   On June 21, 2006, Dr. Berger saw plaintiff for his annual exam and because plaintiff was seeking a refill of his Vicodin prescription.  (Tr. 366).  Dr. Berger wanted plaintiff to sign a "pain agreement."[5]  The pain agreement plaintiff signed stated that Dr. Berger would prescribe 60 Vicodin for one month, with no refills.  (Id.).

On June 22, 2006 Dr. Fey conducted another IME on plaintiff.  (Tr. 459-467). Dr. Fey noted plaintiff's subjective complaints of pain radiating down his right leg and subjective complaints of persistent waxing and waning right low back pain with radiation to his right buttock and posterior thigh to the knee but not past the knee.  (Tr. 460). Plaintiff noted this pain especially with prolonged sitting, such as when he was driving. (Id.).   Plaintiff was taking Vicodin on an as-needed basis and following up with his medical doctor on an as-needed basis.  (Tr. 461).   According to Dr. Fey, plaintiff was

---

[5]     A "pain agreement" is a written agreement between a physician and patient as a condition to the patient receiving therapy for chronic pain, particularly when opioid analgesic medications are being prescribed.  The pain agreement may describe how frequently the patient may use medication, require the patient to use a single pharmacy and may require the patient to state that he or she will not share medication with friends or family.  See http://www.painandthelaw.org/mayday/brushwood_060302.php.

then working in a position weighing trucks at a quarry.  (Id.).  He was on restrictions of lifting no more than 30 to 40 pounds, and no prolonged sitting.  (Id.)

Dr. Fey's physical examination revealed that plaintiff could touch his fingertips to his toes with his arms and knees extended.  (Tr. 462).  He had mildly decreased extension of his lumbar spine, complaining of right low back pain.  (Id.).  Plaintiff had negative straight leg raise in the bilateral lower extremities.  He was able to walk easily on his heels and toes bilaterally, and had 5/5 strength throughout the bilaterial lower extremities.  (Id.).  Dr. Fey reviewed the medical records, as well as the myelogram that had been completed.  (Tr. 465).  Dr. Fey concluded that "there is no objective evidence that Mr. Leach's symptoms are related to any specific back pathology."  (Tr. 466). Dr. Fey believed that if the EMG finding[6] of possible sciatic nerve neuropraxia was related to the injury plaintiff sustained, then the neuropraxia would resolve, although slowly.  (Id.).  Dr. Fey also stated that based on "an objectively normal examination and considering the above information, I have no change in any specific restrictions indicated regarding Mr. Leach's activities at this time."  (Id.).  Based on the normal exam, and despite plaintiff's subjective complaints, Dr. Fey concluded that "he is in my opinion capable of participating in all vocational, recreational and activities of daily living as he did prior to the motor vehicle accident of July 1, 2005 without restrictions."  (Id.).

Plaintiff was seen for a spot on the right side of his scrotum on August 9, 2006. The spot was benign.  (Tr. 360).  The record from this visit indicated that plaintiff "is out of doors for his work," indicating that plaintiff was working at that point.  (Id.).

---

[6]     Dr. Fey indicated this EMG was performed on March 29, 2006.  The Court presumes this EMG is the same as that submitted by plaintiff with his motion for summary judgment.  See fn.2, supra.

On January 9, 2009, plaintiff underwent another IME, again conducted by Dr. Fey.   (Tr. 439-448).   Dr. Fey noted under "medications" that plaintiff was occasionally taking aspirin.  (Tr. 441).  Dr. Fey's physical examination of plaintiff showed that plaintiff had tenderness diffusely about the right buttock, but his most prominent area of tenderness was specifically in the area of the piriformis muscle just medial to the posterior to the greater tochanter.  (Id.).  Plaintiff demonstrated active forward flexion of his cervical spine, placing his fingertips within 2 inches of his toes, although the complained of "normal" hamstring tightness.  (Id.).  Plaintiff demonstrated full active extension of his lumbar spine without complaining of pain.  (Id.).  Plaintiff had a negative straight leg raise, although he complained of right low back pain with a 90 degree straight leg raise on the right in the seated position.  (Id.).  Dr. Fey noted that plaintiff could walk easily on his heels and toes and demonstrated normal 5/5 strength throughout the bilateral distal lower extremities.  (Id.).

In connection with this IME, Dr. Fey reviewed plaintiff's medical records from the Albert Lea Medical Center, the Mayo Clinic, the neurosurgeon in Iowa who treated plaintiff, and his chiropractic records.  (Tr. 442).  Dr. Fey noted that in the late 1990s plaintiff was seen at the Christian Chiropractic office for symptoms relating to stiffness and achiness in his low back, on the right side.  (Id.).  Dr. Fey opined plaintiff's condition could be consistent with posttraumatic right piriformis syndrome, substantially related to his July 1, 2005 car accident.  (Tr. 446).  Dr. Fey thought that he could not conclusively state that plaintiff was suffering from right piriformis syndrome until further testing was done.  (Tr. 447).  If further testing did not confirm his diagnosis, then Dr. Fey believed that plaintiff sustained a temporary soft tissue sprain/strain/contusion injury.  (Id.).  Apart from the possibility that plaintiff was suffering from piriformis syndrome, Dr. Fey

concluded that any restrictions would be related to preexisting degenerative disease of the spine, and not related to the work accident. (Id.). Dr. Fey hoped that "with appropriate treatment, [plaintiff] will have resolution of the condition of piriformis syndrome to a degree that he would be allowed to return to work without restrictions." (Id.).

There are no treatment records for the period of August 9, 2006 to February 16, 2009, when plaintiff was seen by Dr. Ulrich. (Tr. 355). Dr. Ulrich noted in the record dated February 16, 2009, that he had not seen plaintiff since July, 2005. (Id.) Dr. Ulrich reported that plaintiff had undergone an IME, again conducted by Dr. Fey, and Dr. Fey had recommended that plaintiff receive a right piriformis injection, which would aid in the diagnosis of piriformis syndrome. (Tr. 355). Dr. Ulrich noted that "patient appears in no apparent distress. Examination of lower back reveals some pain to palpation lower lumbosacral area and some pain in the pelvis area consistent with piriformis type pain. Range of motion flexion generally normal." (Tr. 355). Plaintiff reported to Dr. Ulrich that he "does continue with some disability and states that he has been unable to work since that time [July 1, 2005]. He believes that he is on more permanent restrictions of no lifting more than 40 pounds." (Tr. 356).

On February 19, 2009, Dr. Ulrich filled out a "Medical Opinion" form, diagnosing plaintiff with low back pain and post traumatic right piriformis syndrome. (Tr. 345). Dr. Ulrich checked the box indicating that the "patient would not be able to perform any employment in the foreseeable future." (Tr. 345).

On February 25, 2009, plaintiff was seen by Dr. John Waggoner, who diagnosed piriformis syndrome. (Tr. 346-348). Dr. Waggoner's physical examination of plaintiff revealed tenderness over the right SI joint and his clinical impression was that plaintiff

20

was suffering from myofascial pain, low back pain, sacroiliitis, sciatica and piriformis syndrome.  At this visit, plaintiff rated his pain as 6 out of 10.  (Tr. 346).  Dr. Waggoner treated plaintiff with an injection of Depo-Medrol as a piriformis muscle and peri-sciatic nerve block.  (Tr. 347).  Plaintiff received additional injections on the right sacroiliac joint on March 18, 2009 and June 3, 2009.  (Tr. 512).

At the March 18, 2009 visit with Dr. Waggoner, plaintiff reported an overall 50% improvement as a result of the piriformis injection.  (Tr. 433).  Plaintiff reported that his pain now centered in the right low back and buttock area.  Sitting and lifting worsened the pain, but Percocet, walking and lying down helped to relieve it.  [Tr. 433].  At that visit, plaintiff rated his pain as 6/10 and 8/10 at its worst.  (Id.).  Dr. Waggoner's physical exam revealed "strength, sensory and reflex exam normal and symmetric, upper and lower extremities." (Id.).  Plaintiff had positive right SI provocation and right SI tenderness.  (Id.).  Dr. Waggoner administered an injection of Depo-Medrol in Plaintiff's right SI joint.  (Tr. 434).

At his June 3, 2009 visit with Dr. Waggoner, plaintiff reported the right SI joint injection he received on March 18, 2009 "seemed to have helped him the most" of all of the treatments he had received for his pain, although he only rated his improvement at 25%.  (Tr. 512).  Plaintiff reported to Dr. Waggoner that his pain had returned and was constant, with occasional numbness in his left leg in the morning.  (Id.).  Plaintiff also reported that he pain was exacerbated by sitting, lifting, bending, twisting and lying down.  It was alleviated by rest.  (Id.).  Plaintiff described his pain as 8/10 presently, with the pain increasing to 9/10 at its worst.  (Id.).  Dr. Waggoner's note from the visit indicated that he had a "long discussion" with plaintiff, who presented Dr. Waggoner with "multiple complex questions."  It was Dr. Waggoner's belief that "at this time that

21

this [multifactorial pain] is about there his baseline will be.  He will have intermittent problems with pain that would require intermittent injections such as sacroiliac joint or myofascial trigger point injections.  It is unlikely to improve significantly further and he will have this waxing and waning pattern and abilities as he goes forward."  (Tr. 513). Dr. Waggoner administered another right SI joint injection.  (Id.).

Plaintiff was seen by Dr. Ulrich on May 5, 2009.  (Tr. 520).  Dr. Ulrich noted that Dr. Berger believed plaintiff to have suffered a 10% permanent partial disability.  Dr. Ulrich had a "long discussion" with plaintiff and wrote that "of note, there is a 2-1/2 year discrepancy of seeking medical attention during which time [plaintiff] t[old] me that he was taking over-the-counter medication to maximum and trying to let things settle down He was last seen by Dr. Berger on June 21, 2006 and was seen again by myself at the clinic on February 16, 2009."  (Tr. 520-21).  Dr. Ulrich reported that plaintiff appeared to be in some discomfort and that an examination of his back showed some pain to palpation in the right lower lumbosacral area.  Plaintiff's range of motion was normal, although he demonstrated pain with opposed external rotation of the right leg.  (Tr. 520). Dr. Ulrich noted that "this pain has occurred following the injury so is therefore secondary to [his July, 2005] injury."  (Tr. 520).  Dr. Ulrich suggested that plaintiff see a physical medicine and rehabilitation physician.  (Tr. 521).

In September 2009, plaintiff returned to Dr. Waggoner for another SI injection, reporting that these injections were the only thing that provided him any relief from pain. (Tr. 505).  Plaintiff was taking four Percocet a day for pain, and rated his pain as 8/10. (Id.).  Plaintiff reported to Dr. Waggoner that he experienced a 50% improvement from the SI injection he received in June, 2009.  (Tr. 505).  Plaintiff described his pain as constant, although varying in intensity and character, from aching to sharp.  (Id.).

Plaintiff rated his pain as 8/10.  At that visit, plaintiff received a right sacroiliac joint injection and a right piriformis muscle injection.  (Tr. 506).

On December 30, 2009, plaintiff visited with Dr. Ulrich for the purpose of having Dr. Ulrich fill out a disability form.  (Tr. 557).  Plaintiff's self-report was that he had difficulty with daily living activities, and specifically found it hard to walk long distances. (Tr. 557).  Plaintiff told Dr. Ulrich that he thought it would be extremely difficult for him to work, and that he felt that he had been "rushed" back to work after the accident when, in fact, he believed that "it is almost impossible for him to be employable given his disability."  (Id.)  Dr. Ulrich noted in the record that he told plaintiff that "while I do occupational medicine, I do not routinely grant permanent disability ratings and would suggest that he see a physician who does that more regularly to help him with a permanent disability rating."  (Tr. 558).  Objectively, Dr. Ulrich noted that plaintiff was experiencing some decreased range of motion and flexion related to pain, and plaintiff was having difficulty touching his toes.  (Id.).  However, "straight leg raising was essentially negative with no radicular symptoms into his legs."  (Id.).

On January 6, 2010, Dr. Ulrich filled out a data sheet on plaintiff's behalf at the request of the attorney representing plaintiff in connection with his request for Social Security Disability benefits.  (Tr. 544-553).  Dr. Ulrich listed right sacroiliitis and piriformis syndrome as the medical impairments from which plaintiff was suffering. (Tr. 545.).  Dr. Ulrich noted that plaintiff was taking four Percocet a day, which left him with a "drunk" or "sleepy" feeling, and that he tried to take it in the evening.  (Id.).  On the other hand, in response to the question "Does the patient have adverse side-effects from medication that affect attention, such as sleepiness?", Dr. Ulrich checked "No." (Tr. 548).  Dr. Ulrich checked that plaintiff had a limitation of lumbar spine motion

(Tr. 546) and checked the box indicating that plaintiff needed to change positions every thirty minutes to limit his otherwise intractable pain.  (Tr. 547).  Although Dr. Ulrich noted that plaintiff's activities were limited by pain, he also noted that plaintiff could walk unassisted, travel to and from work without help, walk a block at a reasonable pace, use standard public transportation, carry out routine activities such as banking or shopping, and could climb a few steps using a single handrail.  (Tr. 549).  Dr. Ulrich indicated that plaintiff could not stand or walk 6 to 8 hours a day on a long term basis, but he could stand or walk 30 minutes in a 6 to 8 hour day with normal breaks.  (Tr. 551).  Dr. Ulrich checked that plaintiff could carry up to 20 pounds occasionally and less than 10 pounds frequently, but never while bending.  (Tr. 551).  Dr. Ulrich concluded that "Dan continues with the impairments as noted.  Given the fact that symptoms have persisted--he also has a "chronic pain syndrome" related to this." (Tr. 553).

On January 31, 2010, Dr. Ulrich completed a medical interrogatories form. (Tr. 577-579).   Dr. Ulrich answered that plaintiff could walk one to two city blocks without rest or severe pain, and the plaintiff could sit for thirty minutes before needing to change position.  (Id.).  Further, Dr. Ulrich opined that plaintiff could stand or walk for one hour, with breaks; that plaintiff would have to take unscheduled breaks during the work day of ten to fifteen minutes every hour; that plaintiff's impairment was likely to produce "good days" and "bad days;" and that plaintiff would, on average, experience "bad days" once or twice a week.  (Tr. 578).  According to Dr. Ulrich, the "bad days" would consist of increased back, buttock and leg pain.  (Id.).  Dr. Ulrich also stated that plaintiff could twist, bend, crouch and climb stairs occasionally, but could not climb ladders.  (Id.).

### B.    Plaintiff's Reports

The Social Security Disability Report plaintiff completed in March, 2009 indicated that plaintiff considered October 31, 2007 as the date of the onset of his disability. (Tr. 156).  Plaintiff stated that he returned to work with Ulland Brothers Construction after his accident, but that there were no employment opportunities for him with the company in light of the restrictions imposed on him.  (Id.).  He worked in car sales as an independent contractor from August 7, 2006 to October 22, 2007, and he "tried to make that work" until October 2007.  (Tr. 156, 157).  Plaintiff stated that it was his pain, and the fact that he was taking pain medication, which made him light headed, that made it impossible for him to continue with his position as a car salesman.  (Id.).

The Adult Function Report plaintiff completed at approximately the same time indicated that plaintiff's daughters (ages 15 and 12) were living with him two or three days a week, that he would pick them up at school, cook supper for them, and help them with their homework.  (Tr. 27, 178).  Plaintiff indicated that he had no trouble with his personal care and that he continued to do normal household jobs like laundry, cleaning and lawn mowing, although he noted that the mowing took much longer than it used to.  (Tr. 179).  He noted that he had given up coaching his daughter's hockey team and could no longer golf or travel any distance.  (Tr. 181).  He was getting out once or twice a week, and was going to church, his daughters' sports events and going out for lunch.  (Id.).

### C.    Hearing Before the ALJ

A hearing was held before Administrative Law Judge William Brown on February 8, 2010.  (Tr. 22-46).  Plaintiff's attorney admitted that plaintiff's condition "did not fit squarely within the medical listings" but argued that the opinion of Dr. Ulrich, the

medical records from the Albert Lea Medical Center, and plaintiff's own testimony, would establish that he could not engage in any competitive employment. (Tr. 26).

Under questioning from the ALJ, plaintiff testified that he was divorced and that his two daughters lived with him about 70% of the time. (Tr. 27). He last worked for his brother at a small used car lot, where he worked for about a year, until October, 2007. (Tr. 28). Although his Social Security Disability Report stated that he gave up his work as a used car salesman as a result of his condition, (Tr. 156), plaintiff testified that he left because his brother "closed the business down…." (Tr. 28). Plaintiff further testified that he was taking three Oxycodone per day to manage pain, and up to five or six per day when his pain was bad. (Tr. 29). According to plaintiff, the pain medication made him tired, and "it's like when you've been drinking." (Id.).

Plaintiff testified that during the day he would wake his daughters up, drive them to school, "take care of, you know, some house stuff as much as I can do or I go visit a friend… ." (Id.). Plaintiff also testified that he did the cooking, some of the housework, the shopping, and mowing in the summer, although he testified that when he mowed, he had to stop every 15 or 20 minutes to rest. (Id.). He further testified that he would perform home exercises that he was taught during his rehabilitation. (Tr. 31). Plaintiff stated that he could lift ten pounds for a third of the day, but that standing and walking bothered him because those activities created pain in the piriformis. (Tr. 32). He further stated that at times his hands and leg or foot would be numb, "more so my leg than my upper extremities," and that he could sit for a half hour or forty minutes before it began to bother him. (Id.).

Under questioning from his attorney, plaintiff testified that he was sleeping in the downstairs of his house on a couch rather than in his bedroom "[f]irst of all, it feels

better for me.  I don't have as much pain as sleeping on the bed and second of all, I—

going up and down the stairs bothers me."  (Tr. 34).   Plaintiff also stated that the

injections he was receiving helped relieve his pain, although not entirely, but that after

the injections he could take less pain medication.  (Tr. 35).   Additionally, he indicated

that his daughters help him with shopping and the housework.  (Tr. 36-37).

Dr. Frank Indihar testified as the impartial medical expert.  (Tr. 37).   According to

Dr. Indihar, the record sustained two major diagnoses.   First, lumbosacral degenerative

disc disease with spinal stenosis at L2 to 3 and chronic pain syndrome and, second,

right piriformis syndrome with sciatica and sacroilitis and chronic pain.  (Id.).   According

to Dr. Indihar, plaintiff's diagnoses did not meet or equal any of the listings contained in

the regulations for the following reasons:

> With regard to the first diagnosis, I do not believe that he
> meets or equals 1.04, disorders of the spine, A, B or C, and I
> would cite 1F-4.  That's 3/8/06, a CT of the spine reveals a
> moderate L2 to 3 central stenosis, but no nerve
> impingement; a myelogram in Exhibit 1F-6 of 3/8/06 reveals
> moderate stenosis at L2 to 3 with only mild stenosis L1 to 2
> to 3 to 4 and 4 to 5.  I would cite occupational therapy
> capacity in 2F-65.  This is 4/18/06 in which therapist opines
> that the patient should be able to sit six out of eight, stand
> and walk eight out of eight, seventy-five to eighty pounds
> lifting.  That's in medium work.  There are multiple physical
> therapy notes through that period of time as well.  I would
> also cite an independent medical exam of 1/22/09.  This is in
> 6F-8 to 14 in which point there was negative straight leg
> raising, deep tendon reflexes were equal, five over five
> strength, a new diagnosis of the patient with the piriformis
> syndrome and then suggests the injections.  I would also
> look at Exhibit 6F-28 to 36.  This is in 6/22/06.  This is an
> orthopedic exam and opinion at which point he has a normal
> exam and he opines that he believes that the treatment has
> been excessive.  I would also refer to 16F-8 and this is just
> recently submitted on 1/6/10, the primary's RFC, seems to
> place the patient within a light category with some postural
> changes.  And in 17F-4, the spine doctor in the exam says
> the patient does have decreased forward flexion, but straight

> leg raising is negative and no radicular symptoms into the legs. With regard to the right piriformis syndrome, I would have the same citations and I do not believe that he meets or equals 1.08, soft tissue injury, which is really where this piriformis syndrome comes from, or 1.04, disorders of the spine, A, B or C, or 1.02, major dysfunction of a joint, A.

(Tr. 38-39).

On the basis of this evidence, Dr. Indihar placed plaintiff at a light RFC, with postural limitations such as no ladders, ropes, scaffolds and only occasional balancing, stooping, kneeling, crouching and crawling. (Tr. 39). Dr. Indihar recommended eliminating hazards and heights because of the oxycodone, (Tr. 40), and, based on plaintiff's testimony, recommended that changes of position, not necessarily a sit/stand, every 30 minutes would be helpful (Tr. 39). Dr. Indihar also testified under questioning from plaintiff's attorney that plaintiff's medication would not affect the RFC he was recommending, but that oxycodone could affect plaintiff's ability to maintain "pace and persistence" in work. (Tr. 40). Dr. Indihar disagreed with Dr. Ulrich's assessment that plaintiff should be given the ability to take a break for fifteen minutes after every hours, noting that he thought that was "a little excessive" and that was why he "tried to put this in with the changes of position every 30 minutes as to accommodate his need to maneuver around a little bit." (Tr. 41).

Mitch Norman, the impartial vocation expert then testified. The ALJ proposed a hypothetical in which he asked Norman to assume that an individual could lift 10 pounds frequently and 20 pounds occasionally, stand and walk for six out of eight hours and sit for six hours out of eight, that the job would allow for a change of position every thirty minutes, and that the individual could not work at heights, around hazards or hazardous machinery, could only occasionally balance, stoop, crouch, kneel or crawl, must avoid exposure to extreme heat and cold and vibration, would be capable of concentrating on,

understanding and remembering routine, repetitive tasks, carrying out routine, repetitive tasks in unskilled work, and would be able to tolerate the routine stress of a routine, low stress work setting with low to moderate standards for pace and production.  (Tr. 42-43).  Norman responded that an individual with those limitations could not perform plaintiff's past relevant work.  (Tr. 43).  Norman then identified the positions of mail clerk and housekeeper as positions an individual with those restrictions could perform. (Tr. 43).

Next, the ALJ asked Norman to assume all of the facts stated in his first hypothetical, and to also assume that the individual could only lift five pounds frequently, ten pounds occasionally, walk two out of eight hours and sit for six out of eight hours.  (Tr. 43).  Norman again testified that such an individual could not perform plaintiff's past relevant work, but he could perform the jobs of order clerk or lens inserter.  (Tr. 44).  Norman testified that his testimony was consistent with the Dictionary of Occupational Titles and the work as he understood it is performed in the regional and national economies.  (Id.).  On questioning from plaintiff's attorney, Norman testified that if, in addition to the limitations described by the ALJ in his hypotheticals, that the individual had to take multiple unscheduled breaks during the course of the day, possibly once each hour up to fifteen minutes, that this individual could not perform any of the jobs Norman had identified.  (Tr. 45).

## V.   DISCUSSION

Plaintiff alleges that the ALJ committed two errors.  First, he the ALJ did not give appropriate consideration and weight to the opinions of plaintiff's treating physician, Dr. Ulrich, as to the extent of his functional limitations.  Plaintiff's Motion for Summary Judgment ("Pl. Mem.") [Docket No. 10], pp. 12-14.  Second, the ALJ failed to give due

consideration to his description of his pain symptoms and their effect on his ability to perform work-related activities.  Id., pp. 14-16.

### A.   Medical Opinions

The ALJ specifically rejected Dr. Ulrich's opinion that plaintiff could not perform any employment in the foreseeable future.  (Tr. 15, citing Ex. 4F, contained at Tr. 345).  The ALJ did, however, incorporate certain of Dr. Ulrich's opinions into the RFC, including the limitation that plaintiff could carry 20 pounds occasionally and 10 pounds frequently, and that plaintiff would need to change positions every thirty minutes.  (Tr. 15, 544-53, 577-79).  The ALJ rejected Dr. Ulrich's opinions that plaintiff could only stand or walk for one hour with breaks and he would have to have to take a break every hour for fifteen minutes.  (Tr. 578).  The ALJ cited Dr. Waggoner's opinion that plaintiff experiences a waxing and waning pattern of pain that plaintiff was able to tolerate without medical treatment or medication between 2006 and 2009.  (Tr. 15).

Although a treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and not inconsistent with other substantial evidence in the record, an ALJ need not accept the opinion if it does not meet those criteria.  Clevenger v. Social Sec. Admin., 567 F.3d 971, 974 (8th Cir. 2009).  If the ALJ does not grant controlling weight to the treating physician's opinion, the ALJ must determine how much weight to grant a non-controlling medical opinion.  20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2).  The ALJ must apply the following factors:

> (1) whether the source has examined the claimant; (2) the length, nature and extent of the treatment relationship and the frequency of examination; (3) the extent to which the relevant evidence, "particularly medical signs and laboratory findings," supports the opinion; (4) the extent to which the opinion is consistent with the record as a whole; (5) whether the opinion is

related to the source's area of specialty; and (6) other factors "which tend to support or contradict the opinion."   20 C.F.R. §§ 404.1527(d), 416.927(d), see also Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).)

Owen v. Astrue, 551 F.3d 792, 800 (8th Cir. 2008).   In addition, the ALJ must give reasons for giving weight to or rejecting the statements of a treating physician.   See 20 C.F.R. § 404.1527(d)(2).   In other words, whether the ALJ gives great or small weight to the opinions of treating physicians, the ALJ must give good reasons for giving the opinions that weight.   Novak v. Barnhart, No. C05-0169, 2006 WL 4079116, at *19 (N.D. Iowa Aug. 4, 2006) (citing Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir.2001) and 20 C.F.R. § 404.1527(d)(2)).

Plaintiff argued that the ALJ erred by failing to give Dr. Ulrich's opinions controlling weight.   Pl. Mem., pp. 12-14.   Additionally, plaintiff asserted the ALJ erred in stating that Dr. Ulrich's opinions were not supported by objective findings when, in fact, plaintiff's diagnosis of piriformis syndrome and sacroiliitis were well-established by objective findings.   Id., p. 14.

As a preliminary matter, the Court observes that Dr. Ulrich did not treat plaintiff between July 22, 2005 (17 days after his accident) and February 16, 2009 (Tr. 410, Tr. 521).   From July 22, 2005 to August 9, 2006, plaintiff was seen primarily by Dr. Berger, and also went to Dr. Grayden and Dr. Waggoner for piriformis and SI joint injections.   Then he saw no one at all until February 2009, when he returned to Dr. Ulrich and saw him two more times for treatment, once on February 16, 2009 and again on May 5, 2009.   The balance of plaintiff's treatment in 2009 was with Dr. Waggoner who he saw four times for SI injections.   Thus, while Dr. Ulrich was certainly a treating physician, he was not the only treating physician who saw plaintiff.   It

was Dr. Berger who spent the most time with plaintiff in 2005 and 2006, and notably, never opined that plaintiff could not perform any sort of work.  In 2009, plaintiff treated most frequently with Dr. Waggoner, who in March 2009 indicated that plaintiff's physical examination was for the most part normal, (Tr. 433), and who in June 2009, determined that plaintiff's pain and abilities would wax and wane.  (Tr. 513).

In addition, Dr. Ulrich's statement that plaintiff could not perform any employment in the foreseeable future, (Tr. 345), is conclusory and invades the issue ultimately reserved for the Commissioner.  See Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) (issue of disability reserved to Commissioner); Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) (issue of RFC reserved to Commissioner).  A conclusory statement by a treating physician is not entitled to greater weight than another physician's statement and "does not amount to substantial evidence of disability."  Metz v. Shalala, 49 F.3d 374, 377 (8th Cir. 1995).  Likewise, Dr. Ulrich's statement that plaintiff is disabled is a legal conclusion, and is not entitled to any special weight.  See 20 C.F.R.§ 404.1503(b); House v. Astrue, 500 F.3d 741. 745 (8th Cir. 2008) ("[a] treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.") (citing Krogmeier v. Barnhart, 294 F.3d 1019, 1023 (8th Cir. 2002)).

The Court further finds that the ALJ's rejection of Dr. Ulrich's opinions on frequency of breaks and the length of time plaintiff could stand in an 8-hour day, is supported by the record as a whole.  In rejecting Dr. Ulrich's opinions, the ALJ cited to Dr. Ulrich's own admission that "he did not routinely grant permanent disability ratings" and his suggestion that plaintiff see a physician who does that more regularly to help him with a permanent disability rating.  (Id.).  The ALJ also referenced plaintiff's ability to

32

manage his pain without medical treatment or the use of pain medications from 2006 to 2009.  (Tr. 15).[7]  More importantly, no other doctor or medical professional placed these types of restrictions on plaintiff.

This Court concludes that the ALJ appropriately explained the weight he gave to Dr. Ulrich's opinions and why he placed significant weight on the impartial medical examiner, Dr. Indihar, who had the opportunity to review the entire record and hear plaintiff's testimony, and upon Dr. Waggoner who had seen plaintiff most frequently in 2009.  Dr. Ulrich was the <u>only</u> medical provider to suggest that if plaintiff was employed he would need to take a break for up to fifteen minutes every hour and he could only stand one hour in an eight hour day.   As Dr. Indihar noted, the record indicated that occupational therapist Patty Peterson, who conducted the functional capacities evaluation in connection with plaintiff's worker's compensation claim, concluded that plaintiff could sit for six hours out of an eight hour day and could work or stand for eight out of eight hours.  (Tr. 246).  Further, Peterson never suggested that plaintiff would have to rest every hour for fifteen minutes at a time.  Similarly, Dr. Berger, who treated plaintiff quite frequently, noted that plaintiff "fits medium restrictions."   (Tr. 370).  Dr. Berger also noted plaintiff's return to work fulltime in 2005 and plaintiff's apparent ability to maintain and tolerate that schedule.  (Tr. 400).

Similarly, Dr. Fey, who conducted three IMEs on plaintiff, did not conclude that plaintiff was unable to work or place the kinds of functional limitations upon plaintiff that Dr. Ulrich did.  (Tr. 449-467).  In the first IME, in October 2005, Dr. Fey concluded that

---

[7]      The ALJ stated that "[b]y Dr. Waggoner's view, the claimant has a waxing and waning pattern of pain which he has been able to tolerate without medical treatment or use of pain medications from 2006 to 2009."  Dr. Waggoner noted plaintiff's pattern of pain (Tr. 513) and Dr. Ulrich noted plaintiff's use of over-the-counter medication and lack of treatment between 2006 and 2009 (Tr. 521).

plaintiff had <u>no</u> assignable Permanent Partial Disability based on the Minnesota Department of Labor and Industry Partial Disability schedule.  (Tr. 454).  In the second IME in June 2006, Dr. Fey stated that based on "an objectively normal examination and considering the above information, I have no change in any specific restrictions indicated regarding Mr. Leach's activities at this time."  (<u>Id.</u>).  Further, despite plaintiff's subjective complaints, Dr. Fey concluded that "he is in my opinion capable of participating in all vocational, recreational and activities of daily living as he did prior to the motor vehicle accident of July 1, 2005 without restrictions."  (<u>Id.</u>).  Dr. Fey opined that with appropriate treatment, plaintiff would be able to return to work without any restrictions at all.  (Tr. 447).  In the third IME in January 2009, Dr. Fey found that plaintiff could walk easily on his heels and toes and noted that he hoped that with appropriate treatment plaintiff could return to work full time.  (Tr. 447).

Even Dr. Ulrich, who had not seen plaintiff since July, 2005, noted on February 16, 2009, that plaintiff was in no apparent distress.  (Tr. 355).

At the end of the day, it is the "province of the ALJ, not the Court, to weigh and resolve conflicting evidence provided by medical professionals."  <u>Lundgren v. Astrue</u>, Civ. No. 09-3395 (RHK/LIB), 2011 WL 882084 at *12 (D. Minn., Feb. 7, 2011) (Report and Recommendation adopted by <u>Lundgren v. Astrue</u>, 2011 WL 883094 at *1 (D. Minn., March 11, 2011) (citing <u>Bentley v. Shalala</u>, 52 F.3d 784, 785 (8th Cir. 1995) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians.")).

This Court finds no error in the way in which the ALJ considered and weighed the medical evidence and the opinions of the physicians who treated and examined plaintiff.

The ALJ's decision was reasonable and based on the substantial record as a whole and it should not be disturbed.

## B.   Credibility Analysis

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

     1. the claimant's daily activities;
     2. the duration, frequency, and intensity of the pain;
     3. precipitating and aggravating factors;
     4. dosage, effectiveness, and side effects of medication; and
     5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same).  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  Cox, 160 F.3d at 1207.  The ALJ may consider whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of Plaintiff's subjective complaints.  Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole."  Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993.))   For example, the ALJ may find a claimant's subjective complaints inconsistent with daily

activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 1207.  If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony."  Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

"It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations."  Id.  On the other hand, the failure to address each of the Polaski factors separately does not render the ALJ's determination invalid.  See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000) (finding that although the ALJ had not explicitly articulated his credibility determination, she did so implicitly by evaluating the claimant's testimony under the Polaski factors and by identifying inconsistencies between the claimant's statements and evidence in the record); see also Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000) (holding that ALJ was not required to methodically discuss each Polaski consideration, so long as he acknowledged and examined those considerations).

Ultimately, the determination of a claimant's RFC and the determination of whether a claimant is disabled are issues reserved to the Commissioner.  See Vossen, 612 F.3d at 921 ("[t]he ALJ bears the primary responsibility for determining a claimant's RFC… ."); Cox, 495 F.3d at 619 (issue of RFC reserved to Commissioner).

Plaintiff argues that the ALJ's credibility analysis is flawed because he failed to recognize that "there is nothing in the record, and in fact no other evidence that contradicts any of the [plaintiff's] testimony."  Pl. Mem., p. 15.  According to plaintiff, there was no reason for the ALJ to doubt the credibility of plaintiff's testimony that he

suffers from "severe and incapacitating pain on a daily basis that severely limits his ability to work."  Id.  This Court finds otherwise.

First, the ALJ acknowledged the Polaski factors, (Tr. 13), and found that the plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms "are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (Tr. 13-14).  The ALJ considered the record as a whole, including plaintiff's testimony, and explicitly referenced and explained the significance of the objective medical evidence, and plaintiff's activities of daily living in concluding that plaintiff's self-reports were not credible.  Tr. 14-15.

For example, the ALJ explained that while the medical record supported the finding that plaintiff suffered from the severe impairments of degenerative disc disease, piriformis syndrome and sacroilitis with chronic pain, he also noted that plaintiff was living independently, he could independently care for himself, he was engaged in a wide range of household chores, he cared for his two teenage daughters, drove and got out regularly to visit friends, shop and attend appointments.    (Tr. 15-16).    These observations were supported by plaintiff's testimony and the Adult Function Report he completed in March 2009.  (Tr. 29, 178-181).  "[D]aily activities alone do not disprove disability, [but] they are a factor to consider in evaluating subjective complaints of pain." Wilson v. Charter, 76 F.3d 238, 241 (8th Cir. 1996).  Furthermore, "[i]nconsistencies between subjective complaints of pain and daily living patterns may also diminish credibility."  Pena v. Charter, 76 F.3d 906, 908 (8th Cir. 1996); see also Lawrence v. Charter, 107 F.3d 674, 676-77 (8th Cir. 1997) (an ALJ may discredit complaints that are inconsistent with daily activities).  Among the daily activities that the Eighth Circuit has found contradict disabling pain, are: regularly cleaning one's house, Spradling v. Chater,

126 F.3d 1072, 1075 (8th Cir.1997); Chamberlain, 47 F. 3d at 1494; cooking, (id.) and grocery shopping.  Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir.1996).

The ALJ considered other factors as well, such as the lack of evidence of neurologic deficits, plaintiff's lack of medical care between 2006 and 2009, the fact that the injections by Dr. Waggoner did provide relief, Dr. Fey's observation that plaintiff demonstrated full active extension of the lumbar spine without complaints of pain, and plaintiff's demonstrated ability to walk easily on his heels and toes, 5/5 strength in the lower extremities.  (Tr. 14-15).  The ALJ properly considered all of this evidence when making his credibility determination.

Second, substantial evidence in the record supports the ALJ's credibility analysis and determinations.  As discussed above, the objective evidence establishes that plaintiff suffers from degenerative disc disease, sacroilitis and piriformis syndrome and the record also reflects his reports pain associated with these conditions.  At the same time, however, the record also indicates that the objective findings over time were minimal and improved over time, (Tr. 238, 355, 433, 441, 455, 462, 466, 441, 520, 588); plaintiff's pain and abilities waxed and waned, (Tr. 512); he experienced significant relief when given trigger point injections and SI injections, (Tr. 391, 433, 505, 512); and he felt better and tolerated more activities with fewer restrictions with time.  (Tr. 399, 401, 404, 405, 416, 549).  Indeed, in January 2010, Dr. Ulrich noted plaintiff could walk unassisted, travel to and from work, walk a block at a reasonable pace, and carry out routine activities.  (Tr. 549).

It is also significant that for nearly three years plaintiff did not treat at all.  "Failure to seek aggressive medical care is not suggestive of disabling pain."  Chamberlain v. Shalala, 47 F.3d 1489, 1495 (8th Cir. 1995) (citing Barrett v. Shalala, 38 F.3d 1019,

1023 (8th Cir. 1994); Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988)).   While the general rule is that failure to seek medical care is generally inconsistent with a finding of disability, that rule may be tempered if there is evidence that the failure to seek care was the result of mental illness or inability to pay the expense of care.   See Bauer v. Social Sec. Admin., 734 F. Supp. 2d 773, 806 (D. Minn. 2010).   Here, plaintiff's only explanation for the lapse in care was that the physicians at the Albert Lea Medical Center "could not come to a consensus as to the cause of his ongoing pain symptoms. In addition, Plaintiff appeared to have reached the full benefit of conservative therapy." Plaintiff's Reply Memorandum, p. 3 [Docket No. 13].   At the hearing, plaintiff testified that he no longer had medical insurance through the county, but there was no testimony that his lapse of care from June 2006 until February 2009 was related to his financial situation.

The record also reflects that plaintiff's application for benefits was filed only after the car dealership where he had been working fulltime closed and he lost his job, and not because of his chronic pain.   "Courts have found it relevant to credibility when a claimant leaves work for reasons other than [his] disability." Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005).

Considering the record as a whole, plaintiff's subjective complaints of "severe and incapacitating pain" are not supported by substantial evidence, and the ALJ appropriately considered the Polaksi factors in determining that plaintiff's subjective complaints were unsupported.

## VI.    CONCLUSION

There is no dispute that plaintiff suffers from the serious conditions of piriformis syndrome, degenerative disc disease of the lumbar spine and sacroilitis with chronic pain.  In addition, there is absolutely no doubt that plaintiff suffers pain as a result of his conditions.  But the issue before this Court is whether the record as a whole supports a finding that plaintiff cannot work.  After a complete and thorough review of the record, this Court has determined that plaintiff has not sustained his burden that his medical condition precludes fulltime employment.  Substantial evidence in the record supports the ALJ's determination that plaintiff was not disabled.  Substantial evidence in the record also supports the ALJ's analysis and conclusions regarding plaintiff's credibility and ultimately, the residual functional capacity determination made by the ALJ.  For all of these reasons, this Court concludes that the ALJ did not err in determining that plaintiff was not disabled within the meaning of the Social Security Act.

**IT IS RECOMMENDED that:**

1.    Plaintiff's Motion for Summary Judgment [Docket No. 9] should be denied;

2.    Defendant's Motion for Summary Judgment [Docket No. 11] should be granted.

Dated:      August 5, 2011

*s/Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

## NOTICE

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court and serving all parties by **August 19, 2011,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  A party may respond to the objecting party's brief within fourteen days after service thereof.  All briefs filed under this Rule shall be limited to

3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.   Unless the parties stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this report and Recommendations, the party making the objections shall timely order and file a complete transcript of the hearing on or before **August 19, 2011.**